Citation Nr: 1706046 
Decision Date: 02/28/17 Archive Date: 03/03/17

DOCKET NO. 10-16 872 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Roanoke, Virginia


THE ISSUES

1. Entitlement to service connection for bilateral lower extremity peripheral neuropathy, to include as secondary to exposure to sarin and cyclosarin during the Persian Gulf War and presumptive service connection for a qualifying chronic disability. 

2. Entitlement to service connection for major depressive disorder (MDD), to include as secondary to bilateral lower extremity peripheral neuropathy. 

3. Entitlement to service connection for right ear hearing loss. 

4. Entitlement to service connection for chronic infections, to include presumptive service connection for a qualifying chronic disability. 

5. Entitlement to service connection for fibromyalgia. 

6. Entitlement to service connection for obstructive sleep apnea. 

7. Entitlement to a total disability rating based upon individual unemployability (TDIU) due to service-connected disabilities. 


REPRESENTATION

Appellant represented by: Karl A. Kazmierczak, Attorney


WITNESS AT HEARING ON APPEAL

The Veteran and his spouse


ATTORNEY FOR THE BOARD

D. Chad Johnson, Associate Counsel


INTRODUCTION

The Veteran served on active duty from January 1985 to February 1992, including active service in the Southwest Asia theater of operations during the Persian Gulf War from December 1990 to March 1991. 

These matters come before the Board of Veterans' Appeals (Board) from March 2009 and September 2015 rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO) in Seattle, Washington and Roanoke, Virginia, respectively. 

The Veteran and his spouse testified before the undersigned Veterans Law Judge (VLJ) at an October 2013 Central Office Board hearing in Washington, DC, and a transcript of the hearing has been associated with the claims file. 

The March 2009 Seattle RO decision denied the Veteran's claims of entitlement to service connection for bilateral lower extremity peripheral neuropathy, MDD, right ear hearing loss, and chronic infections. 

The September 2015 Roanoke RO decision denied the Veteran's claims of entitlement to service connection for fibromyalgia and obstructive sleep apnea, and entitlement to a TDIU rating, after which the Veteran filed a timely notice of disagreement (NOD) in May 2016. See 38 C.F.R. § 20.201 (2016). When a claimant files a timely NOD, the RO must prepare and send to the claimant a statement of the case (SOC). 38 C.F.R. §§ 19.26, 19.29 (2016). Thus, although the Veteran's claims of entitlement to service connection for fibromyalgia and obstructive sleep apnea, and entitlement to a TDIU rating, were not certified to the Board on appeal, the Board will address them herein for the sole purpose of ensuring the issuance of an SOC, as it does not appear from the record currently before the Board that an SOC has yet been issued addressing those particular issues. 

As such, the issues of entitlement to service connection for fibromyalgia and obstructive sleep apnea, and entitlement to a TDIU rating, are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction (AOJ). 


FINDINGS OF FACT

1. The Veteran had active service in the Southwest Asia theater of operations during the Persian Gulf War from December 1990 to March 1991. 

2. The Veteran's bilateral lower extremity peripheral neuropathy did not have onset during active service or within one year of separation from active service, is not etiologically related to active service, to include exposure to sarin and cyclosarin during the Persian Gulf War, and does not result from a medically unexplained chronic multisymptom illness. 

3. The Veteran's MDD did not have onset during active service and is not etiologically related to active service or a service-connected disability. 

4. The Veteran does not have a current right ear hearing loss disability for VA purposes. 

5. The Veteran's claimed chronic infections have each been attributed to a known clinical diagnosis with a medical etiology and defined pathophysiology. The probative evidence of record does not document a nexus between any chronic infections and the Veteran's active service. 


CONCLUSIONS OF LAW

1. The criteria for service connection for bilateral lower extremity peripheral neuropathy, to include as secondary to exposure to sarin and cyclosarin during the Persian Gulf War and presumptive service connection for a qualifying chronic disability, have not been met. 38 U.S.C.A. §§ 1110, 1112, 1117, 1131, 5107; 38 C.F.R. §§ 3.102, 3.303, 3.307, 3.309, 3.317 (2016). 

2. The criteria for service connection for MDD, to include as secondary to bilateral lower extremity peripheral neuropathy, have not been met. 38 U.S.C.A. §§ 1110, 1131, 5107; 38 C.F.R. §§ 3.102, 3.303 (2016). 

3. The criteria for service connection for right ear hearing loss have not been met. 38 U.S.C.A. §§ 1110, 1112, 1131, 1137, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.307, 3.309, 3.385 (2016). 

4. The criteria for service connection for chronic infections, to include presumptive service connection for a qualifying chronic disability, have not been met. 38 U.S.C.A. §§ 1110, 1117, 1131, 5107; 38 C.F.R. §§ 3.102, 3.303, 3.317 (2016). 





REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Due Process

VA has statutory duties to notify and assist claimants in substantiating a claim for VA benefits. See, e.g., 38 U.S.C.A. §§ 5103, 5103A (West 2014); 38 C.F.R. § 3.159 (2014). The RO provided the required notice regarding the Veteran's service connection claims discussed herein by way of letters sent to the Veteran in October 2008 and December 2008. 

Regarding the duty to assist, the RO has obtained the Veteran's service treatment records, service personnel records, VA treatment records, private treatment records, Social Security Administration (SSA) disability records, and lay statements, and associated all such records with the claims file. 

VA provided relevant examinations in May 2007, August 2007, and July 2014. When read together and considered as a whole, the examinations and opinions are adequate regarding the Veteran's claims adjudicated herein because they were based on thorough examinations, appropriate diagnostic tests, and reviews of the Veteran's medical history; moreover, they are supported by reasoned rationales and contain sufficient information to allow the Board to apply the relevant statutes and regulations. See Barr v. Nicholson, 21 Vet. App. 303, 312 (2007); Stefl v. Nicholson, 21 Vet. App. 120, 124-25 (2007). 

Neither the Veteran nor his attorney has identified any additional evidence to be added to the claims file. As all necessary development has been accomplished, no further notice or assistance is required for a fair adjudication of the Veteran's claims decided herein and, therefore, appellate review may proceed without prejudice to the Veteran. 



II. Service Connection - Generally 

Service connection may be granted for a disability resulting from a disease or injury incurred in or aggravated by active service. See 38 U.S.C.A. §§ 1110, 1131 (West 2014); 38 C.F.R. § 3.303(a) (2016). "To establish a right to compensation for a present disability, a Veteran must show: "(1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service"-the so-called "nexus" requirement." Holton v. Shinseki, 557 F.3d 1362, 1366 (Fed. Cir. 2010) (quoting Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004)). 

Service connection may also be granted on a secondary basis for a disability which is "proximately due to or the result of a service-connected disease or injury". 38 C.F.R. § 3.310(a) (2016). Where a service-connected disability aggravates a nonservice-connected condition, a Veteran may be compensated for the degree of disability (but only that degree) over and above the degree of disability existing prior to the aggravation. Allen v. Brown, 7 Vet. App. 439 (1995) (en banc); 38 C.F.R. § 3.310(b). 

The Court of Appeals for Veterans Claims (Court) has held that Congress specifically limited entitlement to service connected benefits to cases where there is a current disability. "In the absence of proof of a present disability, there can be no valid claim." Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992). The requirement of a current disability is "satisfied when a claimant has a disability at the time a claim for VA disability compensation is filed or during the pendency of that claim." See McClain v. Nicholson, 21 Vet. App. 319, 321 (2007). 

For certain chronic disorders, including hearing loss, service connection may be granted on a presumptive basis if the disease is manifested to a compensable degree within one year following service discharge. 38 U.S.C.A. § 1112 (West 2014); 38 C.F.R. §§ 3.307(a)(3), 3.309(a) (2016). Additionally, for chronic diseases defined by 38 C.F.R. § 3.309(a) and shown in service or by a continuity of symptoms after service, the disease shall be presumed to have been incurred in service. 38 C.F.R. § 3.303(b); Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013). In order to show a chronic disease in service, the record must reflect a combination of manifestations sufficient to identify the disease entity, and sufficient observation to establish chronicity at the time. Where a chronic disease has been incurred in service, subsequent manifestations of the same chronic disease at any later date, however remote, are service-connected unless clearly attributable to intercurrent causes. If a condition noted during service is not shown to be chronic, then generally, a showing of continuity of symptoms after service is required in order to establish entitlement to service connection. Id. 

Additionally, service connection may also be established on a presumptive basis for a Persian Gulf veteran who exhibits objective indications of a qualifying chronic disability that became manifest during active service in the Southwest Asia theater of operations during the Persian Gulf War, or to a degree of 10 percent or more not later than December 31, 2016, and which by history, physical examination, and laboratory tests cannot be attributed to any known clinical diagnosis. 38 U.S.C.A. § 1117 (West 2014); 38 C.F.R. § 3.317 (a)(1) (2016). 

A Persian Gulf veteran is one who served in the Southwest Asia Theater of operations during the Persian Gulf War. 38 C.F.R. § 3.317(e). The Southwest Asia Theater of operations includes Iraq, Kuwait, Saudi Arabia, the neutral zone between Iraq and Saudi Arabia, Bahrain, Qatar, the United Arab Emirates, Oman, the Gulf of Aden, the Gulf of Oman, the Persian Gulf, the Arabian Sea, the Red Sea, and the airspace above these locations. 38 C.F.R. § 3.317(e)(2). 

In this case, the Veteran's service personnel records confirm his service during the Persian Gulf War in the Southwest Asia Theater of operations. Accordingly, the Board finds the Veteran is a Persian Gulf veteran and the provisions of 38 U.S.C.A. § 1117 and 38 C.F.R. § 3.317 may apply if the Veteran is found to have a qualifying chronic disability. 

The term "qualifying chronic disability" means a chronic disability resulting from an undiagnosed illness or a medically unexplained chronic multisymptom illness that is defined by a cluster of signs or symptoms, such as chronic fatigue syndrome; fibromyalgia, or functional gastrointestinal disorders (including, but not limited to, irritable bowel syndrome, functional dyspepsia, functional vomiting, functional constipation, functional bloating, functional abdominal pain syndrome, and functional dysphagia). 38 C.F.R. § 3.317(a)(2)(i). 

For purposes of this presumption, the term "medically unexplained chronic multisymptom illness" means a diagnosed illness without conclusive pathophysiology or etiology, that is characterized by overlapping symptoms and signs and has features such as fatigue, pain, disability out of proportion to physical findings, and inconsistent demonstration of laboratory abnormalities. Chronic multisymptom illnesses of partially understood etiology and pathophysiology, such as diabetes and multiple sclerosis, will not be considered medically unexplained. 38 C.F.R. § 3.317(a)(2)(ii). 

VA regulations clarify that "objective indications of chronic disability" include both "signs," in the medical sense of objective evidence perceptible to an examining physician, and other, non-medical indicators that are capable of independent verification. 38 C.F.R. § 3.317(a)(3). Additionally, disabilities that have existed for 6 months or more and disabilities that exhibit intermittent episodes of improvement and worsening over a 6-month period will be considered chronic. The 6-month period of chronicity will be measured from the earliest date on which the pertinent evidence establishes that the signs or symptoms of the disability first became manifest. 38 C.F.R. § 3.317(a)(4). 

Signs or symptoms which may be manifestations of an undiagnosed illness or medically unexplained chronic multi-symptom illness include, but are not limited to, fatigue, signs or symptoms involving skin, headaches, muscle pain, joint pain, neurological signs or symptoms, neuropsychological signs or symptoms, signs or symptoms involving the respiratory system (upper or lower), sleep disturbances, gastrointestinal signs or symptoms, cardiovascular signs or symptoms, abnormal weight loss, or menstrual disorders. 38 C.F.R. § 3.317(b). 

In claims based on undiagnosed illness, unlike those for direct service connection, there is no requirement that there be competent evidence of a nexus between the claimed illness and service. Gutierrez v. Principi, 19 Vet. App. 1, 8-9 (2004). 
Lay persons, such as the Veteran, are competent to report objective signs of illness such as pain or fatigue. Id at 9-10. To determine whether a qualifying chronic disability is manifested to a degree of 10 percent or more, the rating criteria set forth in the VA Schedule for Rating Disabilities shall be utilized. See 38 C.F.R. § 3.317(a)(5); 38 C.F.R. Part 4 (2016). 

Even where service connection cannot be presumed, however, service connection may still be established on a direct basis. See Stefl, 21 Vet. App. 120; Combee v. Brown, 34 F.3d 1039 (Fed. Cir. 1994). 

With disability compensation claims, VA adjudicators are directed to assess both medical and lay evidence. In addressing lay evidence and determining its probative value, if any, attention is directed to both competency ("a legal concept determining whether testimony may be heard and considered") and credibility ("a factual determination going to the probative value of the evidence to be made after the evidence has been admitted"). See Layno v. Brown, 6 Vet. App. 465, 469 (1994). In terms of competency, lay evidence has been found to be competent with regard to a disease with "unique and readily identifiable features" that is "capable of lay observation." See Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007). In weighing credibility, VA may consider interest, bias, inconsistent statements, bad character, internal inconsistency, facial plausibility, self-interest, consistency with other evidence of record, malingering, desire for monetary gain, and demeanor of the witness. See generally Caluza v. Brown, 7 Vet. App. 498 (1995). 

Once the evidence has been assembled, it is the Board's responsibility to evaluate the evidence. 38 U.S.C.A. § 7104(a) (West 2014). When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant. 38 U.S.C.A. § 5107(b) (West 2014); 38 C.F.R. § 3.102 (2016); see also Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 


II.A. Bilateral Lower Extremity Peripheral Neuropathy

The Veteran claims entitlement to service connection for bilateral lower extremity peripheral neuropathy, to include as secondary to exposure to sarin and cyclosarin during the Persian Gulf War and presumptive service connection for a qualifying chronic disability. 

Service treatment records do not document any complaints, treatment, or diagnosis of bilateral lower extremity peripheral neuropathy. An October 1984 enlistment examination documents normal clinical evaluations, with no defects or diagnoses noted. The Veteran reported various lower extremity injuries during active service, including a left foot injury in December 1987 which was normal upon x-ray, right ankle pain in January 1988 and Achilles tendon pain in February 1988 which were each assessed as tendonitis, and left foot pain in December 1989 which was assessed as a minor sprain; however, there is no documentation of lower extremity peripheral neuropathy. In January 1991, the Veteran waived a physical examination upon separation, and the examining physician's assistant determined that a separation physical was not warranted. 

A July 1997 letter from the Department of Defense indicates that the Veteran may have been exposed to a very low level of the nerve agents sarin and cyclosarin during active service in Iraq in March 1991. Analysis showed that the exposure levels would have been too low to activate chemical alarms or to cause any symptoms at the time, and although little is known about the long-term effects from a brief, low-level exposure to nerve agents, current medical evidence indicated that long-term health problems were unlikely. 

Private treatment records from December 2006 document the Veteran's bilateral lower extremity neuropathic pain of unknown etiology. The Veteran reported that he may have been exposed to nerve gas, and the physician did not know whether or not this was related to his current status. 

In January 2008, the Veteran reported that his symptoms began approximately three to four years ago, with gradual onset of pain in his feet while working. He stated that his pain persisted since his exposure to a nerve agent in 1991. The physician noted the Veteran's condition had not been adequately worked up. In March 2008, he reported his symptoms began with what he thought was restless leg syndrome, which developed into sharp pains in his feet. The physician noted the Veteran had clinical evidence of peripheral neuropathy by sensory testing, but that he also had preserved reflexes; further testing was indicated. In July 2008, the etiology of the Veteran's neuropathy remained unclear; however, the physician noted it had been speculated that the neuropathy could be due to potential exposure to nerve gas given the Veteran's service in the Gulf War. 

In September 2008, the Veteran's private physician noted clinical and EMG evidence of a distal neuropathy, but he stated that testing to look for a cause had been fruitless, as the most common causes, such as diabetes and alcohol, were not known to be present in the Veteran. As such, the physician concluded that it was more likely than not that the reported exposure to a neurotoxic agent played a role in the Veteran's neuropathy, as the physician did not have anything else to explain the condition. 

Subsequent October 2009 private treatment records again note the Veteran's bilateral lower extremity neuropathy, of unclear etiology. In June 2010, it was again stated that the Veteran's condition may be exposure induced. 

An October 2011 SSA case analysis notes that his significant lower extremity pain was suboptimally responsive to treatment, and complicated by his morbid obesity, although his pain was largely related to neuropathy. A February 2012 SSA disability determination and transmittal documents that the Veteran was found to be disabled from November 2006 due to primary affective (mood) disorder, and secondary peripheral neuropathy. 

A November 2012 VA Gulf War examination found that the Veteran's peripheral neuropathy, which affected his feet and lower legs, was of unknown etiology; therefore, the Veteran's disability pattern was a diagnosable illness for which no etiology had been established. A concurrent VA peripheral nerves examination noted that the Veteran's condition was of gradual onset beginning in 1993 and that the etiology remained unknown. 

A September 2013 private opinion concluded that the Veteran's bilateral peripheral neuropathy was more likely than not caused/exacerbated during service; the physician's rationale was based on the Veteran's reports of exposure to sarin gas on numerous occasions. 

In May 2016, following a thorough review of the evidence of record, a VA examiner opined that the Veteran's lower extremity peripheral neuropathy was less likely than not incurred in or caused by active service. Rather, based upon a review of the Veteran's detailed medical history, the examiner concluded that his condition was due to diabetes, rather than exposure to sarin or nerve gas. 

The examiner acknowledged that the Veteran and his treating physician were apparently unaware that he had diabetes; however, the examiner stated that the Veteran's elevated glycohemoglobin test results contained within VA treatment records from November 2012, as well as current test results, each met the criteria for a diagnosis of diabetes. Moreover, the examiner stated that the Veteran's diabetes or neuropathy was not present during his active service. He reviewed the Veteran's history of subjective painful lower extremities beginning in 2006, and although he acknowledged a lack of relevant diabetic lab results from that period, the examiner stated the Veteran's reported history was consistent with early diabetic neuropathy. Additionally, the examiner noted that SSA disability records contained a May 2011 lab result showing an elevated serum glucose level; therefore, the Veteran likely had insulin resistance and early diabetes prior to this time, which is not uncommon to present with neuropathic symptoms. 

The examiner stated that Veteran had diabetic neuropathy, although a diagnosis of overt diabetes was not apparent early on, which was the case in nearly twenty percent of patients. Thus, despite the Veteran's false belief that he did not have diabetes, the examiner concluded, based upon both 2012 and current blood tests, that the Veteran had a positive diagnosis of diabetes. Additionally, it was unlikely that the Veteran had any significant clinical neurotoxicity due to nerve gas because the Veteran did not have any symptoms of nerve gas exposure during the exposure event in 1991 (including seizures and/or coma), and medical literature indicated that such symptoms started at a rapid onset following exposure, rather than ten years later, as claimed by the Veteran. 

Following a review of the relevant evidence of record, the Board finds that the preponderance of evidence weighs against the Veteran's claim of entitlement to service connection for bilateral lower extremity peripheral neuropathy, to include as secondary to exposure to sarin and cyclosarin during the Persian Gulf War and presumptive service connection for a qualifying chronic disability. 

As discussed above, service treatment records fail to document an onset of the Veteran's bilateral lower extremity peripheral neuropathy during active service. 

Post-service private treatment records largely document that the etiology of the Veteran's bilateral lower extremity neuropathy was unknown. Private treatment records in December 2006, July 2008, and June 2010 refer to the Veteran's reported exposure, or speculate that his condition may be related to the reported exposure. Similarly, in September 2008, a private physician concluded that it was more likely than not that the reported exposure to a neurotoxic agent played a role in the Veteran's neuropathy, and in September 2013, a private physician concluded that the Veteran's bilateral peripheral neuropathy was more likely than not caused/exacerbated during service based on the Veteran's reports of exposure to sarin gas on numerous occasions. However, the Board finds that such evidence is of limited probative value, based upon both its largely speculative nature and its reliance upon the Veteran's reports of repeated exposure to nerve agents, which are inconsistent with the 1997 Department of Defense letter that the Veteran may have been exposed. See Tirpak v. Derwinski, 2 Vet. App. 609 (1992); see also Reonal v. Brown, 5 Vet. App. 458, 460 (1993). 

Moreover, most of the probative value of a medical opinion comes from its reasoning. See Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 304 (2008). To the extent that the November 2012 VA examiner found that the Veteran's disability pattern was a diagnosable illness for which no etiology had been established, the most probative evidence of record concerning the Veteran's claim is the May 2016 VA examiner's opinion, rendered following a thorough review of the claims file and relevant medical records, which found that the Veteran's lower extremity peripheral neuropathy was less likely than not incurred in or caused by active service, to include exposure to nerve gas; rather, his condition was due to previously undiagnosed diabetes, based upon previous and current lab results and the Veteran's prior history, which was consistent with insulin resistance and early diabetes. 

Notably, the Veteran is not service-connected for diabetes; moreover, diabetes will not be considered a medically unexplained chronic multisymptom illness for purposes of this presumptive service connection for a qualifying chronic disability. 38 C.F.R. § 3.317(a)(2)(ii). As such, presumptive service connection is not warranted under this regulation. 

The Veteran's lay statements of record regarding his observable symptoms are probative, see Layno, 6 Vet. App. 465; however, to the extent they assert a nexus between the Veteran's bilateral lower extremity peripheral neuropathy and his active service, to include as secondary to exposure to sarin and cyclosarin during the Persian Gulf War and as a qualifying chronic disability, they are afforded less probative value, as the Veteran is not shown to possess the requisite medical expertise to render a medical opinion regarding a complex medical condition such as peripheral neuropathy. See Jandreau, 492 F.3d at 1376-77. 

Given the above, the preponderance of evidence weighs against the Veteran's claim of entitlement to service connection for bilateral lower extremity peripheral neuropathy, to include as secondary to exposure to sarin and cyclosarin during the Persian Gulf War and presumptive service connection for a qualifying chronic disability, both on direct and presumptive bases. As such, there is no reasonable doubt to be resolved, and the claim is denied. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert, 1 Vet. App. 49. 


II.B. MDD

The Veteran next claims entitlement to service connection for MDD, to include as secondary to bilateral lower extremity peripheral neuropathy. 

Service treatment records do not document any complaints, treatment, or diagnosis of MDD. An October 1984 enlistment examination documents normal clinical evaluations, with no defects or diagnoses noted. In January 1991, the Veteran waived a physical examination upon separation, and the examining physician's assistant determined that a separation physical was not warranted. 

Post-service private treatment records from January 2006 first document a diagnosis of depression. In September 2008, the Veteran's pain had affected his overall mental ability in that he was becoming more frustrated, depressed, and irritable. In March 2009, the Veteran reported many stressors in his life, including tension in his marriage due to his financial situation. In April 2009, the Veteran was diagnosed with major depressive affective disorder, with contributing factors including his painful neuropathy and death's in his family; the Veteran was very depressed and hopeless about his life. Ongoing psychiatric treatment records from May 2009 to October 2009 document the Veteran's ongoing depression, with reports of ongoing life stressors including foreclosure, interfamilial relationships, his wife's health issues, and ongoing pain in his feet. 

January 2012 SSA consultant notes document his history of depression and physical difficulties; the consultant noted that it was common and predictable to manifest depression when there is a chronic physical condition, as in the Veteran's case. A February 2012 SSA disability determination and transmittal documents that the Veteran was found to be disabled from November 2006 due to primary affective (mood) disorder, and secondary peripheral neuropathy. 

In September 2013, a private physician opined that the Veteran's depression was less likely secondary to bilateral neuropathy as there was no known association between the two, less likely secondary to an undiagnosed chronic illness as there was no indication of an undiagnosed chronic illness, less likely secondary to hearing loss as the Veteran did not exhibit such correlation, and less likely secondary to chronic infections as there was no indication of such infections or a correlation found. 

Following a review of the relevant evidence of record, the Board finds that the preponderance of the evidence weighs against the Veteran's claim of entitlement to service connection for MDD, to include as secondary to bilateral lower extremity peripheral neuropathy. 

As discussed above, service treatment records do not document any complaints, treatment, or diagnosis of MDD; moreover, the first post-service mention of depression is in January 2006, nearly fourteen years after discharge from active service. Notably, the medical evidence of record consistently attributes the Veteran's depression to his painful bilateral lower extremity peripheral neuropathy, as well as various life stressors. However, as the Board has herein denied the Veteran's claim of entitlement to service connection for bilateral lower extremity peripheral neuropathy, secondary service connection for MDD is not warranted as a matter of law. 38 C.F.R. § 3.310. 

The Board also acknowledges that the Veteran is separately service-connected for posttraumatic stress disorder (PTSD). Upon VA PTSD examinations in September 2015 and May 2016, the VA examiner's diagnosed PTSD and MDD. Although the examiners indicated that it was not possible to differentiate what symptoms were attributable to each diagnosis, this appears to be scrivener's error, as each examiner immediately proceeded to list specifically which specific, identifiable symptoms were attributable to each diagnosis. As such, the Board finds that it is possible to separate the effects of the Veteran's service-connected PTSD from his non-service-connected MDD. See Mittleider v. West, 11 Vet. App. 181, 182 (1998). 

The Veteran's lay statements of record regarding his observable symptoms are probative, see Layno, supra; however, to the extent they assert a nexus between the Veteran's MDD and his active service, they are afforded less probative value, as the Veteran is not shown to possess the requisite medical expertise to render a medical opinion regarding a psychiatric condition. See Jandreau, supra. 

In conclusion, the preponderance of the probative evidence of record weighs against the Veteran's claim of entitlement to service connection for MDD, to include as secondary to bilateral lower extremity peripheral neuropathy. As such, there is no reasonable doubt to be resolved, and the claim must be denied. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert, supra. 


II.C. Right Ear Hearing Loss

The Veteran also claims entitlement to service connection for right ear hearing loss. 

A hearing loss disability is defined for VA compensation purposes with regard to audiologic testing involving puretone frequency thresholds and speech discrimination criteria. 38 C.F.R. § 3.385 (2016). For purposes of applying the laws administered by VA, impaired hearing will be considered to be a disability when the auditory threshold in any of the frequencies of 500, 1000, 2000, 3000, or 4000 Hertz (Hz) is 40 decibels (dB) or greater; or when the auditory thresholds for at least three of the frequencies of 500, 1000, 2000, 3000, or 4000 Hz are 26 dB or greater; or when speech recognition scores using the Maryland CNC test are less than 94 percent. Id. 

Service treatment records do not document that right ear hearing loss first manifested during active service. An October 1984 physical examination upon service enlistment documents a normal clinical evaluation of the Veteran's ears and concurrent audiometric testing did not document right ear hearing loss as defined by VA regulation. 38 C.F.R. § 3.385. Similarly, reference audiograms in July 1985 and December 1989, as well as an undated reference audiogram, do not document right ear hearing loss as defined by VA regulation. Id. In January 1991, the Veteran waived a physical examination upon separation, and the examining physician's assistant determined that a separation physical was not warranted. 

Post-service private treatment records from March 2005 and April 2010 likewise document puretone threshold results of audiometric testing which fail to document right ear hearing loss consistent with VA regulation. Id. To the extent that the April 2010 test results appear to document a right ear word recognition score of 92 percent, the Board notes that this result was based upon the Central Institute for the Deaf (CID) Auditory Test W-22, rather than the Maryland CNC Test as required per VA regulation; therefore, this result is of no probative value in determining the presence of right ear hearing loss. Id. Moreover, a May 2010 letter following the April 2010 testing reports that the Veteran's audiometric testing was remarkable for left ear hearing loss, with no mention of corresponding right ear hearing loss. 

Upon VA audio examination in December 2012, the Veteran reported decreased hearing, more so in the left ear, which caused difficulty in conversations. Following audiometric testing, the examiner noted that the Veteran's puretone threshold levels in the right ear did not meet the VA criteria for a right ear hearing loss disability. Id. 

A September 2013 private opinion concluded that it was more likely than not that the Veteran's claimed right ear hearing loss was caused by his military service based on the Veteran's reported history of exposure to loud noises during service and a hearing test; however, this opinion is of little probative value because it is unclear which hearing test the opinion is referring to and in any event, the medical evidence of record does not document that the Veteran has had a right ear hearing disability as defined by VA regulation for any period on appeal. 

Although the evidence of record fails to indicate any hearing loss within the relevant auditory thresholds during service, the Board notes that the absence of in-service evidence of hearing loss is not fatal to a claim for service connection. See Ledford v. Derwinski, 3 Vet. App. 87, 89 (1992). Competent evidence of a current hearing loss disability and a medically sound basis for attributing such disability to service may serve as a basis for a grant of service connection for hearing loss. See Hensley v. Brown, 5 Vet. App. 155, 159 (1993). However, as discussed above, "[i]n the absence of proof of a present disability, there can be no valid claim." Brammer, 3 Vet. App. at 225. Significantly, the Veteran is not shown by the probative evidence of record to have a right ear hearing loss in accordance with 38 C.F.R. § 3.385 at any time during the pendency of the appeal. 

The Veteran's statements of record regarding his observable symptoms, such as hearing difficulty, are probative evidence, see Layno, supra; however, to the extent such statements attempt to diagnose hearing loss according to VA regulations, to include whether it was manifested to a compensable degree during active service or within the year subsequent to service discharge, such statements are of little probative value. See Jandreau, supra. Notably, the diagnosis of a hearing disability for VA purposes is based on objective audiometric testing and is not simply determined based on mere personal observation by a layperson. See 38 C.F.R. § 3.385. Thus, the question of whether the Veteran has a hearing disability for VA purposes does not lie within the range of common experience or common knowledge, but requires special experience or special knowledge in the field of audiology, including audiometric testing. 

In conclusion, the most probative evidence of record weighs against the Veteran's claim of entitlement to service connection for right ear hearing loss, as there is no probative evidence that the Veteran has a current right ear hearing loss disability. As the preponderance of the evidence is against the Veteran's claim, there is no reasonable doubt to be resolved, and the claim must be denied. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert, supra. 


II.D. Chronic Infections

Finally, the Veteran claims entitlement to service connection for chronic infections, to include presumptive service connection for a qualifying chronic disability. 

Service treatment records do not document complaints, treatment, or diagnosis of chronic infections during active service. An October 1984 physical examination upon service enlistment documents normal clinical evaluations. In January 1991, the Veteran waived a physical examination upon separation, and the examining physician's assistant determined that a separation physical was not warranted. 

Private treatment records from September 2003 document the Veteran's report of frequent boils over his body and his history of MRSA skin infections. The physician noted that it appeared he may have furunculosis, although there was no evidence upon examination. In January 2007, the Veteran complained of persistent perineal pain with drainage. Upon examination, there was a tender subcutaneous mass without erythema or evidence of active infection or drainage; the physician assessed a subcutaneous mass which may have been a sebaceous cyst. In February 2007, the Veteran reported at least six previous surgeries for chronic perineal drainage. In November 2009, the Veteran complained of recurrent infections on his scrotum; this was assessed as a sebaceous cyst. 

In May 2016, a VA examiner concluded that it was less likely than not that the Veteran's claimed chronic infections were incurred in or caused by active service. The examiner noted his history of perirectal abscess surgeries in 1999 and 2000, with prior instances in 1998 while residing in Germany. The examiner noted that the condition was no longer present, however. Regarding the Veteran history of bumps on his skin, diagnosed as carbuncles, furuncles, boils, and folliculitis, the examiner noted that it was due to his history of diabetes. Additionally, the examiner noted the Veteran's history of stasis dermatitis on his legs due to morbid obesity, rather than active service. Similarly, the examiner noted the Veteran's remote history of foot ulcers and infections, which was also likely due to his diabetes. In sum, the examiner opined that the Veteran had disease with specific etiologies and diagnoses. Moreover, the claimed exposure was not the cause of his conditions; rather, they were caused by a medical etiology with a defined pathophysiology. 

Following a review of the relevant evidence of record, the Board finds that the preponderance of the evidence weighs against the Veteran's claim of entitlement to service connection for chronic infections, to include presumptive service connection for a qualifying chronic disability. 

Initially, the Board notes that to the extent that the Veteran has claimed presumptive service connection for a qualifying chronic disability, his various claimed chronic infections have each been attributed to a known clinical diagnosis with a medical etiology and defined pathophysiology. As such, presumptive service connection for a qualifying chronic disability is not warranted. See 38 C.F.R. § 3.317. 

Notably, service treatment records do not document an onset of chronic infections during active service, and the probative evidence of record does not document a nexus between any chronic infections and the Veteran's active service. As such, the preponderance of evidence also weighs against the Veteran's claim for direct service connection. As the preponderance of evidence is against the Veteran's claim, there is no reasonable doubt to be resolved, and the claim must be denied. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert, supra. 


ORDER

Service connection for bilateral lower extremity peripheral neuropathy, to include as secondary to exposure to sarin and cyclosarin during the Persian Gulf War and presumptive service connection for a qualifying chronic disability, is denied. 

Service connection for major depressive disorder (MDD), to include as secondary to bilateral lower extremity peripheral neuropathy, is denied. 

Service connection for right ear hearing loss is denied. 

Service connection for chronic infections, to include presumptive service connection for a qualifying chronic disability, is denied. 


REMAND

As noted in the Introduction above, the Veteran has submitted a timely May 2016 NOD regarding the RO's September 2015 denial of his claims of entitlement to service connection for fibromyalgia and obstructive sleep apnea, and entitlement to a TDIU rating. See 38 C.F.R. § 20.201. 

An SOC is required when a claimant protests a determination. 38 C.F.R. §§ 19.26, 19.29. To date, no SOC has been furnished in response to the Veteran's timely May 2016 NOD, or at least no SOC has been associated with the claims file that is now before the Board. Therefore, remand is required for the issuance of an SOC regarding the Veteran's claims of entitlement to service connection for fibromyalgia and obstructive sleep apnea, and entitlement to a TDIU rating. See Manlincon v. West, 12 Vet. App. 238, 240-41 (1999). The SOC must be issued unless the Veteran's claims are resolved, such as by a complete grant of the benefits sought, or withdrawal of the May 2016 NOD. 

The remanding of these particular issues must not be read as an acceptance of jurisdiction over the same by the Board. The Board may only exercise jurisdiction over an issue after an appellant has filed both a timely NOD to a decision denying the benefit sought and a timely substantive appeal after issuance of an SOC. 38 U.S.C.A. § 7105 (West 2014); Roy v. Brown, 5 Vet. App. 554 (1993). Therefore, the AOJ should return the Veteran's claims of entitlement to service connection for fibromyalgia and obstructive sleep apnea, and entitlement to a TDIU rating, to the Board only if the Veteran perfects his appeal in accordance with the provisions of 38 U.S.C.A. § 7105. 

Accordingly, the case is REMANDED for the following action:

Issue an SOC addressing the issues of entitlement to service connection for fibromyalgia and obstructive sleep apnea, and entitlement to a TDIU rating. The Veteran must be advised of the time limit in which he may file a substantive appeal as to that issue. 38 C.F.R. § 20.302(b) (2016). If, and only if, the Veteran timely perfects an appeal, return the matters to the Board for further appellate consideration, if otherwise in order

The Veteran has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).



______________________________________________
K. PARAKKAL
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs